UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ASHLEY MINGO, DAYANA FRAGOSO &
GABRIEL THOMPSON,

                                            Plaintiffs,

                       - against -


THE CITY OF NEW YORK AND NEW YORK CITY
POLICE DEPARTMENT,


                                       Defendants.
-------------------------------------------------------------------X

**CASE NO._____**

**COMPLAINT**


**PLAINTIFFS DEMAND
TRIAL BY JURY**

## COMPLAINT

Plaintiffs ASHLEY MINGO, DAYANA FRAGOSO, and GABRIEL THOMPSON through undersigned counsel, sues Defendants, THE CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT and alleges the following upon information and belief:

## NATURE OF THE ACTION

1.       Ashley Mingo ("Ms. Mingo" or "Plaintiff") is deaf and communicates through American Sign Language. This action is on behalf of Ms. Mingo for declaratory and injunctive relief and monetary damages to redress the injuries Ms. Mingo has suffered as a result of being discriminated against by Defendant(s) on the basis of disability, record of disability and/or perceived disability under the Americans with Disabilities Act ("ADA"); Section 504 of the Rehabilitation Act, New York State Human Rights Law and the New York City Human Rights Law, to remedy injuries Plaintiff has suffered as a result of being discriminated against, and deprived of public services and public accommodations due to her disability. Ms. Mingo had encounters with police which ultimately left her with multiple tickets, suspension of her license,

1

and an arrest due to the fact that she could not understand what officers were telling her.  Without effective communication Plaintiff had little ability to understand her interactions with police officials.  The Complaint states causes of action under federal, state, and city law for deprivations of civil rights and states common law causes of action for tort.

2.      Dayana Fragoso ("Ms. Fragoso" or "Plaintiff") is deaf and communicates through American Sign Language.  This action is on behalf of Ms. Fragoso for declaratory and injunctive relief and monetary damages to redress the injuries Ms. Fragoso has suffered as a result of being discriminated against by Defendant(s) on the basis of disability, record of disability and/or perceived disability under the Americans with Disabilities Act ("ADA"); Section 504 of the Rehabilitation Act, New York State Human Rights Law and the New York City Human Rights Law, to remedy injuries Plaintiff has suffered as a result of being discriminated against, and deprived of public services and public accommodations due to her disability.  Ms. Fragoso was arrested and detained by the NYPD as the result of a fight she engaged in with her mother while she was a minor.  Despite numerous requests for a sign language interpreter, Ms. Fragoso was denied effective communication during her interactions with the police at the police station and subsequent incarceration.  The complaint states causes of action under federal, state, and city law for deprivations of civil rights and states common law causes of action for tort.

3.      Gabriel Thompson ("Mr. Thompson" or "Plaintiff") is deaf and communicates through American Sign Language.  This action is on behalf of Mr. Thompson for declaratory and injunctive relief and monetary damages o redress the injuries Mr. Thompson has suffered as a result of being discriminated against by Defendant(s) on the basis of disability, record of disability and/or perceived disability under the Americans with Disabilities Act ("ADA"); Section 504 of the Rehabilitation Act, New York State Human Rights Law and the New York City Human Rights

Law, to remedy injuries Plaintiff has suffered as a result of being discriminated against, and deprived of public services and public accommodations due to his disability.  Mr. Thompson had several interactions with the NYPD.  During each interaction, Plaintiff requested a qualified interpreter to communicate and was denied the ability to communicate.  The complaint states causes of action under federal, state, and city law for deprivations of civil rights and states common law causes of action for tort.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this action arises under federal law, including the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 *et seq*. and Section 504 of the Rehabilitation Act pursuant to 29 U.S.C. §794 *et seq*.  Plaintiffs also bring this action pursuant to 42 U.S.C. § 1983 for violations of Title II of the ADA to redress the deprivation of rights, privileges, and immunities of which Plaintiffs have been deprived.

5.     Plaintiffs invoke the pendant jurisdiction of this Court pursuant to *Gibb*, 38 U.S. 715 (1966) and 28 U.S.C. § 1367(a) for state law claims of the New York State Human Rights Law and New York City Human Rights Law.

6.     The Plaintiffs, ASHLEY MINGO, DAYANA FRAGOSO and GABRIEL THOMPSON, bring this action under 42 U.S.C. Section 1983 and related state and federal laws seeking compensatory damages, injunctive relief, and attorney's fees for the Defendant City of New York's violation of their rights afforded by the United States and New York Constitution and under the laws of The State of New York and the City of New York

7.     The venue of this action is properly placed in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because the events having operative significance in this case which give rise to the claims herein occurred within this District.

8.     This Court has *in personam* jurisdiction over Defendants because they are located in, conduct operations within, transact business in and provide services within the City of New York.

## PARTIES

9.     Plaintiff Ashley Mingo is a resident of the State of New York and resides in Manhattan, New York.

10.     Plaintiff Dayana Fragoso is a resident of the State of New York and resides in Staten Island, New York.

11.     Plaintiff Gabriel Thompson is a resident of the State of New York and resides in Brooklyn, New York.

12.     At all times material herein, defendant THE CITY OF NEW YORK ("CITY OF NEW YORK"), was and still is a duly incorporated municipality of the State of New York, County of New York, whose seat of governance was and still is located at 250 Broadway, New York, New York 10007.

13.     At all times material herein, defendant NEW YORK CITY POLICE DEPARTMENT (hereinafter referred to as "NYPD"), is located at 1 Police Plaza, New York, New York 10038.

## MATERIAL FACTS - ASHLEY MINGO

14.     At all times material herein, Plaintiff was deaf and her primary language was and remains American Sign Language.

15.     Upon information and belief, on May 12, 2017 Ashley Mingo had an appointment with a realtor to look at apartments.  While waiting for the realtor, Ms. Mingo was double-parked when an NYPD police car came up behind her.  An officer apparently used a bullhorn to try to get Plaintiff's attention; however, because Plaintiff was deaf, she could not understand what was being said, and stayed in her car.

16.     She then waited for the police officer to approach her so she could understand what was being said.  While she waited, she quickly wrote a note stating that she was deaf and could not hear.

17.     Had Plaintiff been hearing she would have immediately heard the bullhorn being used and moved her car, thus avoiding any interaction with the NYPD Officer.  As a direct result of Plaintiff not hearing what was said to her, the officer then approached her car and appeared quite frustrated and unwilling to attempt appropriate communication with Plaintiff before issuing a citation.

18.     Plaintiff attempted to show the officer her note in an effort to have him write to her. The note stated that she was deaf and could not communicate verbally.  The officer refused to read the note or write back and forth, and continued to speak to Plaintiff who had no understanding of what was being said to her.  Plaintiff received a ticket for double-parking without being able to understand why or to explain to the Officer that she would then move on.

19.     Had the officer treated her like any other non-disabled driver who was double-parked he would have just written down that she had to move her car, once he realized she was deaf, and not issued a ticket.

20.    Upon information and belief, on September 3, 2018 Plaintiff stopped for ice cream with friends after attending a festival.  There were no parking spots available, so Plaintiff waited behind a police car, whose officer was ticketing another car, and then pulled around it.

21.    The officer used his bullhorn – which she could not hear – then ticketed her for disobeying traffic laws.  Plaintiff repeatedly asked the police to get her an interpreter so she could understand what she did wrong, but they denied each request.  Plaintiff had to call her mother to help interpret.  She was then issued a ticket once again without the opportunity to effectively communicate with the officer.

22.    Upon information and belief, in August 2019, Plaintiff called the NYPD after being sideswiped by a car while taking her sister to the airport.  During this call, Plaintiff let the police know that she was at the scene of the accident and required a sign language interpreter to communicate.

23.    Officers from the NYPD came without an interpreter and only spoke to the man who hit her car.  They then arrested Plaintiff without speaking to her for driving with a suspended license.  Plaintiff was unaware that her license was suspended due to her not paying for the ticket she had been given while at the festival.  Plaintiff again asked for an interpreter, but officers did not provide one.

24.    Plaintiff was arrested, booked and placed in jail for ten hours during which she had no effective way to communicate.  She had never been incarcerated before and was terrified, frustrated and upset, which was made worse as she could not communicate effectively.

25.    During each of these encounters with Defendant, Plaintiff was often caught unaware of the situation due to her deafness.  Plaintiff was not able to hear the early warning from the bullhorn, nor was she aware that her license had been suspended due to a ticket she had received

during a confusing encounter with police at an ice cream stand.  Without the aid of a qualified interpreter, Plaintiff was unable to effectively communicate with the police officers during each of her interactions with them.

## MATERIAL FACTS - DAYANA FRAGOSO

26.    At all times herein, Plaintiff was deaf and her primary language was and remains American Sign Language.

27.    Upon information and belief, in June 2017, Plaintiff was a 16-year-old minor who came home on the last day of school.

28.    Plaintiff became engaged in a physical altercation with her mother when her mother tried to take her phone away.  Afterward, Plaintiff went outside where she saw an ambulance and asked them where the police station was located.  The ambulance staff took her to the hospital where NYPD Officers were there to meet her.

29.    Plaintiff requested an interpreter and was given a Video Remote Interpreter ("VRI") to use.  The VRI did not work properly, and after a significant amount of time an on-site sign language interpreter came to the hospital.

30.    Plaintiff was discharged shortly thereafter and brought to the police station.  Despite requests, an interpreter was not provided at the police station.  Police then spoke with her mother, who is hearing.

31.    Police removed her cochlear implant, without which Plaintiff could not hear anything.  They also handcuffed her behind her back, which made it impossible for her to attempt to use sign language or even to gesture.

32.    Plaintiff went through the booking process without an interpreter, not understanding the reasons or implications of her arrest.  Plaintiff, who was only 16 years old, was

placed in a cell separate from her mother. Plaintiff was terrified of the situation she was in and completely unaware of what was going to happen to her without an explanation through the use of a sign language interpreter.

33.    Plaintiff continues to this day to be under severe emotional stress, scared and anxious about the situation that occurred with the Police. The situation was made all the more traumatizing without Plaintiff having an effective means of communication, which left her unaware of the charges she was facing or the length of time she would remain at the jail.

## MATERIAL FACTS - GABRIEL THOMPSON

34.    At all times herein, Plaintiff was deaf and his primary language was and remains American Sign Language.

35.    Upon information and belief, on December 25, 2019 Plaintiff felt that he was the victim of an assault that occurred while he was sleeping in his apartment, which he shares with 5 deaf roommates.

36.    Plaintiff went to the hospital to be examined. The NYPD was called and officers arrived to investigate the situation. A VRI was provided by the hospital, which officers used to communicate with the Plaintiff.

37.    One week later, NYPD officers arrived at Plaintiff's apartment to question him about the alleged assault. Although officers had used the VRI to communicate effectively with Plaintiff in the hospital, officers did not bring an interpreter with them to communicate. They instead relied on a female officer who had some basic knowledge of sign language. She was not, however, a qualified interpreter, and Mr. Thompson was not able to communicate fully and effectively with the officers. Mr. Thompson asked officers to provide a qualified interpreter, but

instead of doing so, they left his apartment without Plaintiff feeling like he had the opportunity to communicate effectively with the officers.

38.     Upon information and belief, on January 28, 2020, Plaintiff again felt like he had been assaulted and went to the hospital again.  One week after that, he was called by the NYPD in Forest Hills to come in for questioning with a detective.  Again, the NYPD used an officer to interpret who was not qualified and thus ineffective in communicating.  Despite requests made for a qualified interpreter, none was provided.

39.     Upon information and belief, on March 29, 2020 Plaintiff was at his daughter's home and became engaged in a physical altercation with his daughter. Plaintiff called 911 for the police and specifically asked for an interpreter to come as well.  Officers arrived hours later without an interpreter.  Plaintiff attempted to write down what had occurred, but the officers ignored this. They told him to return his daughter's keys, and to leave, never effectively communicating with him although he was the one who called the police and the police never arrested his daughter, although Plaintiff had clear marks of injury on his body.

40.     Upon information and belief, on May 2, 2020 NYPD officers came to Plaintiff's house after one of his roommates called about purported stolen money.  Plaintiff was questioned without an interpreter, despite his request to have an interpreter present.

41.     Throughout Plaintiff's highly sensitive incidents, Plaintiff was unable to accurately and effectively communicate in order to describe the crimes which had been committed against him.  Without a sign language interpreter, it was impossible for him to effectively communicate and convey to Police the seriousness of the crimes, and the fear and anxiety he felt not only from the incidents themselves, but from his inability to seek help without effective communication in the same manner that is afforded to hearing people.

<u>**COUNT I**</u>
<u>**DISCRIMINATION UNDER THE**</u>
<u>**AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT**</u>

42.    Plaintiffs repeat and re-allege paragraph 1-41 fully as if said paragraphs were fully set forth herein at length.

43.    Defendants CITY OF NEW YORK and their agents, servants, officers, and/or employees acted under color of statute, ordinance, regulation, custom or usage of a State.

44.    Defendants NEW YORK CITY POLICE DEPARTMENT and their agents, servants, officers and/or employees acted under color of statute, ordinance, regulation, custom, or usage of a State.

45.    Title II of the ADA "applies to all services, programs, and activities provided by or made available by public entities." *See* 28 C.F.R. §35.130(b)(7).

46.    Section 12132 of the ADA specifically states:

No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

47.    Section 504 of the Rehabilitation Act, 29 U.S.C. §794(a) specifically states:

No otherwise qualified individual with a disability…shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

48.    The anti-discrimination provisions of Title II of the ADA and Section 504 of the Rehabilitation Act are enforceable through implied private rights of action.

49.    Plaintiffs are "qualified individuals" inasmuch as they are individuals who have a disability, deafness, and "who with or without reasonable modifications to rules, policies or practices, the removal of … communication … barriers, or the provision of auxiliary aids and

services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. Section 12131(2).

50.    Defendants CITY OF NEW YORK and NYPD are covered entities inasmuch as each is a public entity.

51.    Defendants who interacted with Plaintiffs from CITY OF NEW YORK and NYPD, regarded each of them as being disabled and were aware of their deafness as evidenced by records of NYPD. Defendants had no protocol in place as required by law to ensure effective communication with deaf individuals.

52.    Plaintiffs were entitled to the same law enforcement services and child protection services that Defendants CITY OF NEW YORK and NYPD provide to other non-disabled persons.

53.    Plaintiffs were entitled to the benefit of lawful exercises of police and child protection powers, including but not limited to the right not to be unlawfully discriminated against and detained.

54.    No interpreter or auxiliary communication device was provided to Plaintiffs by Defendants CITY OF NEW YORK and NYPD, despite these Defendants' obligations under federal, state, and local law, as well as Defendant's police department's settlement agreement with the United States of America to resolve claims of deaf discrimination by the New York City Police Department.  Such settlement agreement is attached hereto as Exhibit "A".

55.    The CITY OF NEW YORK is further liable for the violations of the ADA and Rehabilitation Act by its employees as the CITY OF NEW YORK has official policies or customs that caused Plaintiffs to be subjected to a violation of their rights under the ADA and Rehabilitation Act as follows:

(a) The CITY OF NEW YORK has expressly or impliedly adopted a policy or custom that the ADA is inapplicable to on-the-street or emergency interactions with the deaf or hearing impaired until an arrest has been made. Such policy directly caused Plaintiffs injuries herein as the accommodations the ADA requires of qualified interpreters or auxiliary communicated devices were denied to Plaintiffs during the above events and deprived them of their rights under the ADA, to wit: the policy of the ADA, express or implied, being inapplicable to on-the-street interactions with the deaf caused the police officers who responded to Plaintiffs homes, vehicles, and hospitals to forcibly ticket, restrain, arrest, detain, and transport Plaintiffs, as well as question Plaintiffs without requesting or utilizing the services of a qualified interpreter or auxiliary communication device to communicate with Plaintiffs to determine whether or not there existed probable cause to arrest them. This resulted in Plaintiffs Dayana Fragoso and Ashley Mingo being held against their will and Plaintiff Gabriel Thompson unable to effectively communicate the purported crimes that were being committed against him.  With the advent of technology, there are applications now available in which police officers could have obtained a qualified interpreter though remote video means even during on the street interactions to ensure effective communication with deaf individuals.  Yet the NYPD has failed to avail themselves of these means and continue to deprive deaf individuals of effective communication.

(b) The CITY OF NEW YORK failed to train its police officers on how to interact with the deaf and hard of hearing communities in a manner to respect their rights under the ADA and the Rehabilitation Act.  The failure to train occurred in a manner

evincing a deliberate indifference to the rights of the deaf and hard of hearing. Specifically after the settlement agreement between the New York City Police Department and the United States of America in 2009, (Exhibit "A"), the Defendants were on notice that their procedures and officer training were not satisfying their legal obligations under the ADA to the deaf and hard of hearing communities, and as such, they were on notice that deaf persons were having their civil rights violated. Notwithstanding such notice and the 2009 agreement, the City has not made effective changes, upon information and belief, to the training program of police officers following the agreement. This lack of training despite notice of deficiencies in interacting with the deaf and hard of hearing communities led to the officers who interacted with Plaintiffs treating them in the manner described above. The lack of training in how to interact with deaf and hard of hearing individuals resulted in the police officers who responded to Plaintiffs' homes, vehicles, and hospitals failing to request an interpreter and/or use an auxiliary communication device, resulting in such police officers verbally speaking to Plaintiffs and issuing verbal orders to Plaintiffs despite the fact that Plaintiffs could not hear the police officers.

56.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered adverse consequences. Plaintiffs suffered physical injury, severe extreme humiliation, emotional pain, and trauma, to their detriment.

## COUNT II
## DISCRIMINATION UNDER THE NEW YORK STATE EXECUTIVE LAW

57.    Plaintiffs repeat and reallege Paragraphs 1-56 as if said paragraphs were fully set forth herein at length.

58.     All Defendants' acts, practices, and policies described herein constitute discrimination against Plaintiffs on the basis of their disability in violation of New York State Executive Law § 296, *et seq.*

59.     All Defendants' acts, practices, and policies described herein constitute discrimination against Plaintiffs on the basis of their record of disability, in violation of New York State Executive Law § 296, *et seq.*

60.     All Defendants' acts, practices and policies described herein constitute discrimination against Plaintiffs on the basis of their perceived record of disability, in violation of New York State Executive Law § 296, *et seq.*

61.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered adverse consequences, Plaintiffs suffered physical injury, severe extreme humiliation, emotional pain, and trauma to their detriment.

<u>**COUNT III**</u>
<u>**DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE**</u>
<u>**CODE**</u>

62.     Plaintiffs repeat and reallege Paragraphs 1-61 as if said paragraphs were fully set forth herein at length.

63.     All Defendants' acts, practices, and policies herein constitute discrimination against Plaintiffs on the basis of their disability, in violation of the New York City Administrative Code §8-107, *et seq.*

64.     All Defendants' acts, practices, and policies herein constitute discrimination against Plaintiffs on the basis of their record of disability, in violation of the New York City Administrative Code §8-107, *et seq.*

65.     All Defendants' acts, practices, and policies herein constitute discrimination against Plaintiffs on the basis of their perceived record of disability, in violation of the New York City Administrative Code §8-107, *et seq.*

66.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered adverse consequences.  Plaintiffs suffered physical injury, severe extreme humiliation, emotional pain, and trauma to their detriment.

## COUNT IV
## PURSUANT TO § 1983 FOR VIOLATION OF THEIR RIGHTS UNDER THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION

67.     Plaintiffs repeat and reallege Paragraphs 1-66 as if said paragraphs were fully set forth herein at length.

68.     The Fourth Amendment provides individuals the right to be free from unreasonable seizures, including arrest without probable cause.

69.     The police officers employed by CITY OF NEW YORK were acting under color of law when they handcuffed Plaintiffs Ashley Mingo and Dayana Fragoso and transported them to a jail against their will.

70.     All charges were subsequently dismissed in connection with the events described above.

71.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered adverse consequences, Plaintiffs suffered physical injury, severe extreme humiliation, emotional pain, and trauma, to their detriment.

## COUNT V
## INJUNCTION

72.     Plaintiffs repeat and reallege Paragraphs 1-71 as if said paragraphs were fully set forth herein at length.

73.     Money damages are insufficient to fully address the claims set forth herein, and irreparable injury will result unless Plaintiffs are granted a permanent injunction requiring New York City Police Department's officers to provide effective communication through the use of interpreter services whether through on-site interpreters or auxiliary communication devices for all interactions whether on the street, at a person's home or at the police station or jail.

74.     The police officers who injured Plaintiffs as described above are officers who are assigned to the precinct that serves Plaintiffs' permanent residences and as such Plaintiffs are likely to have contact in the future with this police precinct.

75.     The police department provides a wide variety of public services that members of the public, including Plaintiffs, have a right to benefit from.

76.     Plaintiffs are likely to utilize one or more of such services which include law enforcement, emergency services, answering questions, and peaceful community assistance services in the future.

77.     Plaintiffs are likely to be engaged in the same behavior that resulted in the actions of the Defendant described above: lawfully being present in their permanent residences, or on public streets, and not being engaged in illegal behavior, and interaction with police officers from the City of New York is likely to ensure in the future as residents of the City of New York.

78.     Plaintiffs are and will in the foreseeable future remain persons of limited English proficiency who communicate effectively solely through American Sign Language.

WHEREFORE, Plaintiffs demand judgment as follows:

i.      On the First Cause of Action, a judgment against Defendants and an award of compensatory damages for emotional distress, punitive and/or exemplary damages, attorneys' fees and costs, pre-judgment and post-judgment interest, in an amount to

be determined at trial, and further relief as this Honorable Court deems just, equitable and proper;

ii.    On the Second Cause of Action, a judgment against Defendants and an award of compensatory damages for emotional distress, punitive and/or exemplary damages, attorneys' fees and costs, pre-judgment and post-judgment interest, in an amount to be determined at trial, and further relief as this Honorable Court deems just, equitable and proper;

iii.    On the Third Cause of Action, a judgment against Defendants and an award of compensatory damages for emotional distress, punitive and/or exemplary damages, attorneys' fees and costs, pre-judgment and post-judgment interest, in an amount to be determined at trial, and further relief as this Honorable Court deems just, equitable and proper;

iv.    On the Fourth Cause of Action, a judgment against Defendants and an award of compensatory damages for emotional distress, punitive and/or exemplary damages, attorneys' fees and costs, pre-judgment and post-judgment interest, in an amount to be determined at trial, and further relief as this Honorable Court deems just, equitable and proper;

v.    On the Fifth Cause of Action, a judgment against Defendants and a permanent injunction requiring the New York City Police Department to have proper training, policies, and procedures in place and to provide reasonable accommodations such as American Sign Language Interpreters or Auxiliary Communication Devices to all deaf or hard of hearing persons whether on-the-street, at a person's home or at the police

station or jail when interacting with law enforcement officers of the City of New York

or NYPD, and further relief as this Honorable Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

Dated:  May 11, 2020
        New York, New York

                          Respectfully submitted,

                          GITLIN, HORN AND VAN DE KIEFT LLP

                          By: /s/Christopher M. Van de Kieft
                          Christopher M. Van de Kieft
                          Bruce Gitlin
                          Gitlin, Horn & Van de Kieft LLP
                          2095 Broadway, Suite 411
                          New York, NY 10023
                          (212) 514-5437
                          cvandekieft@ghvlaw.com


                          CLARA R. SMIT, ESQ

                          By:/s/Clara R. Smit
                          Clara R. Smit, Esq.
                          100 Horizon Center Blvd
                          Hamilton, NJ 08691
                          (732) 843-6600

# EXHIBIT A

Settlement Agreement between the United States and the New York City Police Department

# SETTLEMENT AGREEMENT

# BETWEEN

# THE UNITED STATES OF AMERICA

# AND

# THE NEW YORK CITY POLICE DEPARTMENT

WHEREAS, this matter was initiated by complaints filed pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, alleging, inter alia, that New York City Police Department ("NYPD" or the "Department") employees, including police officers, did not effectively communicate with people with hearing impairments in violation of Title II of the ADA;

WHEREAS, the NYPD does not admit and denies any and all liability arising out of the allegations contained in these complaints;

WHEREAS, one of the individual complainants has reached a separate agreement releasing the NYPD in consideration for a payment that the complainant has received from the NYPD;

WHEREAS, the United States of America, through the United States Department of Justice, United States Attorney's Office, Southern District of New York, (the "United States") is authorized under 28 C.F.R. Part 35 to investigate whether the NYPD is in compliance with Title II of the ADA;

WHEREAS, the NYPD is an agency of the City of New York, a "public entity" for purposes of 42 U.S.C. § 12132 and the implementing regulations, 28 C.F.R. § 35.104, et seq., and the United States Department of Justice is the "designated agency" responsible for investigating the complaint, 28 C.F.R. § 35.190(b)(6); WHEREAS, the United States is authorized to investigate the facts, issue findings and, where appropriate, attempt informal resolution of such complaints, see 28 C.F.R. § 35.170-172;

WHEREAS, the United States and the NYPD have the mutual goal of ensuring that the NYPD complies with the requirements of Title II of the ADA;

IT IS HEREBY AGREED between the NYPD and the United States:

1. This Settlement Agreement (the "Agreement") is entered into pursuant to 28 C.F.R. § 35.172.
2. In consideration for the NYPD's performance of its obligations under this Agreement, the United States agrees to refrain from undertaking further investigation or from filing a civil suit based on the complaints described above.

## POLICY AND DEFINITIONS

3. The NYPD has adopted the Interim Order to the NYPD's Patrol Guide entitled "Interaction with Hearing Impaired Persons." A copy of the Interim Order is attached as Exhibit A. This Interim Order has been

made available to all members of the Police Department.

4. In order to comply with the ADA, the NYPD must continue to take appropriate steps to ensure that its communication with qualified individuals with a disability, consisting of a hearing impairment (hereafter "qualified individual(s) with hearing impairments" or "qualified individual(s)") is effective communication. The parties agree and stipulate that certain terms will be defined for purposes of this Agreement:

    A. "Auxiliary aids and services" will mean qualified interpreters, note takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, Telecommunications Devices for the Deaf (TDDs), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments. See 28 C.F.R. § 35.104.

    B. "Disability" and "Qualified individuals with a disability" will be defined as they are in the ADA, 42 U.S.C. § 12102(2), and 42 U.S.C. § 12131(2), respectively.

    C. "Qualified interpreter" will mean and refer to a sign language or oral interpreter who is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Accordingly, an interpreter must be able to sign to the deaf individual (or interpret orally to the person who does not use sign language) what is being said by the hearing person and to voice to the hearing person what is being signed or said by the deaf individual. The interpreter must be able to interpret in the language the deaf person uses (e.g., American Sign Language or Signed English) and must be familiar with terms and phrases commonly used during booking and detention. Additionally, although a qualified interpreter may be certified, a certified interpreter is not necessarily qualified, if he or she is not a good communications match for the deaf person (e.g., where the deaf person uses Signed English and the interpreter uses American Sign Language) or the situation (e.g., where the interpreter is unfamiliar with the necessary specialized vocabulary).

    D. "Effective communication" will mean communication with persons with disabilities that is as effective as communication with others. Effective communication is achieved by furnishing appropriate auxiliary aids and services where necessary to afford qualified individuals with a disability an equal opportunity to participate in or benefit from the services, programs, or activities of a public entity.

5. In order to ensure the continued effective communication with qualified individuals with hearing impairments in the NYPD's programs, activities and services, the NYPD will:

    a. Continue to ensure that its services, programs and activities are accessible to qualified individuals with hearing impairments, as required by 28 C.F.R. § 35.161, through the use of appropriate auxiliary aids and services, including, but not limited to, the City of New York's "311" non-emergency system (TTY No. 212-504-4115), via the nationwide Telecommunications Relay Service "711", or qualified sign language interpreters. In a situation where the NYPD would allow a person access to a telephone, the NYPD shall provide qualified individuals with hearing impairments the opportunity to place calls through the use of appropriate auxiliary aids and services, including, but not limited to, qualified sign language interpreters.

    b. Continue to provide, at no cost to the qualified individual with a hearing impairment, appropriate auxiliary aids and services, including, but not limited to, qualified interpreters, when necessary to provide effective communication to qualified individuals with hearing impairments. See Exhibit A. In determining whether a qualified interpreter is required, consideration should be given to the nature and importance of the communication at issue, the complexity or length of the communication, and such other factors as are appropriate within the discretion of the NYPD. The NYPD shall continue to maintain a list of "on-call" qualified sign language interpreters who are available 24 hours a day. The NYPD shall provide a qualified sign language interpreter within a reasonable time after the request is made. Sign language services, whether through use of the NYPD's "on-call" list or though the New York Citywide Contract, shall be available 24 hours a day.

    c. Give primary consideration to the requests of qualified individuals with hearing impairments in determining what type of auxiliary aid or service is necessary. "Primary consideration" means that the NYPD will defer to the individual's request, consistent with the NYPD's duties pursuant to 28 C.F.R. § 35.164.

Case 1:20-cv-03659-VSB-OTW Document 1 Filed 05/11/20 Page 22 of 24 #: 23

d. The NYPD will provide notice of the availability of auxiliary aids and services for qualified individuals with hearing impairments through the distribution of pamphlets, posters or other appropriate means, including, but not limited to "The Americans with Disabilities Act What You Should Know," attached hereto as Exhibit B.

## ADA COORDINATOR

6. The NYPD's ADA Coordinator is the Deputy Commissioner, Equal Employment Opportunity. The ADA Coordinator (or her designee) shall:

   a. Be familiar with the process for requesting a qualified sign language interpreter;
   b. Annually either attend a seminar concerning a public entity's obligations under Title II of the ADA, or view an educational video concerning a public entity's obligations under Title II of the ADA. The United States shall provide a list of seminars and videos which shall be acceptable to the United States, which list shall include the video program entitled "Police Response to People With Disabilities," available online at: www.ada.gov/policeinfo.htm. This list shall be provided to the NYPD, attention the Deputy Commissioner, Equal Employment Opportunity within thirty (30) days of the execution of this Agreement and annually thereafter.

## GRIEVANCES

7. The NYPD has adopted the Administrative Guide Procedure No. 308-06: Grievance Procedure for Members of the Public with Disabilities, attached hereto as Exhibit C, as amended, in connection with this Agreement (the "ADA Grievance Procedure"). The NYPD has published this procedure and amendment. Within thirty (30) days of the effective date of this Agreement, the NYPD will post a copy of the Notice entitled "The Americans with Disabilities Act What You Should Know," attached hereto as Exhibit B in those places where notices to the public, employees and job applicants are normally posted. A copy of Exhibit B will also be provided to any person upon request. If a qualified individual with a hearing impairment files a written grievance with the NYPD's ADA Coordinator, in accordance with the ADA Grievance Procedure, the ADA Coordinator will attempt to resolve the grievance according to the procedures set forth in the ADA Grievance Procedure.

8. For a period of three (3) years from the effective date of this Agreement, the NYPD shall send the United States, on an annual basis, a letter containing the following information:

   a. The number of written grievances that have been filed during the relevant reporting period with the ADA Coordinator pursuant to the ADA Grievance Procedure, by persons with hearing impairments in regard to the availability of auxiliary aids and services for qualified individuals with hearing impairments;
   b. A brief, general description of the nature of each grievance; and
   c. A brief, general description of the nature of how each grievance was resolved.

## TRAINING

9. The NYPD shall continue to train all new recruits, supervisory personnel, and executive level staff in the Department regarding the NYPD's policies and procedures concerning qualified individuals with hearing impairments. Beginning with the next recruit or promotional classes following the effective date of this Agreement, the training shall include:

   a. The Interim Order entitled "Interaction With Hearing Impaired Persons," attached hereto as Exhibit A and all other Patrol Guide procedures cross-referenced therein;
   b. The Administrative Guide Procedure No. 308-06: Grievance Procedure for Members of the Public With Disabilities, attached hereto as Exhibit C;
   c. The Pamphlet entitled "Communicating With People Who Are Deaf or Hard of Hearing," attached hereto as Exhibit D;
   d. The Student Assessment Guide, entitled, "The Americans with Disabilities Act and Law Enforcement," attached hereto as Exhibit E.

## ENFORCEMENT

10. The NYPD will report annually to the United States on compliance with this Agreement in accordance with the provisions of paragraph 8, herein. If the United States believes that this Agreement or any portion of it has been violated, within four months of receiving notice of an alleged violation, the United States will notify the undersigned counsel in writing and provide the basis and evidence for the claim of noncompliance. Within thirty (30) days of such notice, counsel for the parties shall meet and confer in an attempt to resolve the issue or issues in good faith. The United States will give the NYPD forty-five (45) days from the date that it notifies the NYPD of any breach of this Agreement to cure that breach, prior to instituting court action, if any. This forty-five (45) day period may be extended by agreement of the parties. If the parties are unable to reach a satisfactory resolution of the issue or issues raised, the United States may, if necessary, take steps to enforce the terms of this Agreement, and the NYPD may oppose.
11. This Agreement is neither an admission by the NYPD of any violation of the ADA, nor an admission by the United States of the merits of any of the NYPD's potential defenses.
12. The NYPD shall not discriminate or retaliate against any person because of his or her participation in this matter.
13. This Agreement is a public document.
14. The Effective Date of this Agreement is the date of the last signature on the Agreement.
15. The term of this Agreement is three (3) years from the Effective Date.
16. The individuals signing this Agreement represent that they are authorized to bind the parties to this Agreement.
17. Failure by the United States to enforce the entire Agreement with regard to any deadline or any other provision of the Agreement, shall not be construed as a waiver of its right to enforce other deadlines or provisions of the Agreement.
18. This Agreement constitutes the entire agreement between the parties relating to the complaints, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this Agreement, shall be enforceable.

For the United States:

PREET BHARARA
United States Attorney for the Southern District of New York

By: _____     Date: _____ 11/18/09 _____

SARAH E. LIGHT
Assistant United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

For the NYPD:

By: _____     Date: _____ 11/18/09 _____

DEBORAH ZOLAND
Assistant Deputy Commissioner,

Legal Matters New
York City Police Department
1 Police Plaza New York, NY


Cases & Matters by ADA Title Coverage | Legal Documents by Type & Date | ADA Home Page


June 14, 2010